# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 7, 2022

Lyle W. Cayce
Clerk

No. 21-30423

Yolanda Landry,

*Plaintiff—Appellant*,

*versus*

Leesville Rehabilitation Hospital, L.L.C.,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:19-CV-465

---

Before Jones, Haynes, and Costa, *Circuit Judges*.

Per Curiam:[*]

Yolanda Landry was a nurse at Leesville Rehabilitation Hospital. She alleged that one of her patients touched her inappropriately and made a sexually suggestive comment, so Landry complained to her supervisor. Around the same time, Landry confronted that patient over a rumor he started and allegedly caused him injury. She was fired shortly thereafter.

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-30423

Landry brings three claims related to her termination: sexual harassment, racial discrimination, and retaliation.   The district court granted Leesville's motion for summary judgment on all three claims.  We AFFIRM.

I

Leesville Rehabilitation Hospital is an inpatient rehabilitation hospital that helps individuals recover from debilitating illness and disease.  Yolanda Landry worked the night shift at Leesville as a Rehabilitation Nurse Technician.  In this role, she was responsible for direct patient care, which included checking patients' vitals and bathing and feeding them.

One of the patients Landry cared for was John Doe.  Doe, a male in his 40s, was admitted to LRH because of a neck and back injury.  When Landry heard that Doe was a new patient, she walked to his room and introduced herself.  This first interaction was uneventful.  A few minutes after their introduction, Doe called the nurse's station and said he was ready for bed, so Landry went to his room to help.  Landry says that while she was helping Doe into his bed, he touched her butt for about five seconds.

Landry immediately reported this inappropriate touching to her direct supervisor, Vicky Turner.  Landry requested that someone accompany her the next time she went into Doe's room, and a fellow nurse volunteered.[1]  A couple minutes later, Doe called the nurse's station again.  Doe asked for "the black aide"—referring to Landry—to come to his room.  Landry walked over alone and, standing by the doorway, asked what Doe needed.  Doe responded, "I just want to let you know you're a sexy, black beautiful woman."  Landry again reported this incident to Turner.

---

[1] Landry claims that Turner did nothing in response, but it is undisputed that another nurse volunteered to go with Landry to Doe's room as needed.  We thus do not see what more Turner should have done.

2

Landry's next interaction with Doe was a few days later. As soon as she arrived for her shift, Doe asked to go outside and smoke. Landry asked Turner for permission to take Doe outside, but Turner refused. So Doe started smoking in the hallway. Landry grabbed the cigarette and stomped it to put it out. When Doe's second request to go outside and smoke was again refused, he eventually went to his room. Soon after, he called the nurse's station, and Landry—alone—went to check on him. When she got to his room, he requested pain medication. Landry does not allege that Doe acted inappropriately on this occasion.

During Landry's next shift, she heard that Doe was spreading a rumor around the hospital. He claimed that the nurses, including Landry, did not take him outside to smoke because they were sleeping on the job. Landry decided that she was going to talk to Doe about the rumor. Accompanied by Turner, Landry walked over to Doe's room. Turner and Landry disagree on exactly what happened next, but they agree on this much: Landry walked in when Doe was supposed to be asleep, flipped on the lights, and told him that she had not been sleeping on the job.

Doe, through his wife, filed a complaint against Landry. Doe's wife explained Doe's side of the story to hospital CEO Jack Causey: Landry burst into Doe's room while he was asleep, flipped on the lights, and startled him awake by yelling at him. When he was startled awake, he reinjured his back. Causey opened an investigation into the incident and suspended Landry pending the investigation in accord with the hospital's disciplinary policy.

As part of the investigation, Causey sought statements from Doe's physician and employees with knowledge of the incident. Doe's physician confirmed that he received a phone call from Doe about the incident and that Doe complained of increased back pain. Turner's statement was consistent with Doe's story. She claimed that Landry woke Doe up by turning on "the

bright overhead light" and then, in a "forceful, verbally aggressive" way, accused Doe of lying about the staff. Turner also referenced other complaints made against Landry. She stated that multiple nurses and patients complained about her attitude, and at least two patients had requested for Landry not to be assigned to their care because of her "condescending manner," her accusations of them of "not being willing to help themselves," and her "lack of caring and patience." She clarified that Landry was a good worker but said she struggled with her "aggressive interpersonal manner." Kristina Cobb, a case manager, also gave a statement based on her conversation with the Doe the day after the incident. According to Cobb, Doe "complained of pelvic pain" and felt like his recovery had regressed. He claimed he had "jumped" in his bed from a lying position when Landry allegedly screamed at him, and since then, his pain had gone from a 6 or 7/10 to a 10/10. In addition, Causey received an anonymous statement indicating that Landry was a good worker.

Landry also wrote a statement in which she depicted her communication with Doe as professional and respectful. She brought that statement to a meeting a few days later with Causey, Cobb, and the Director of Nursing, Elizabeth Bennett. Causey read Landry's statement at the beginning of the meeting, and then Cobb began to discuss their findings from the investigation. The supervisors described the statements they received, and Landry voiced her disagreement with many of them. Ultimately, Causey told Landry that Leesville was letting her go because she had acted inappropriately toward a patient.

Landry maintains that her firing was unlawful. She first exhausted her administrative remedies with the Equal Employment Opportunity Commission and then filed suit in federal court. She brought three claims under Title VII. First, she alleged sexual harassment based on Doe's conduct towards. Next, she claimed that Leesville engaged in racial discrimination by

firing her but not her white coworkers who engaged in similar conduct toward patients. And lastly, she asserted that Leesville fired her in retaliation for her complaints about Doe's conduct. Leesville sought summary judgment, which the district court granted for all three claims.

## II

To survive summary judgment on her hostile work environment claim, Landry must show that a jury could find that she was subject to actionable harassment. For cases in which a customer is the alleged harasser, a reasonable jury must be able to conclude (1) that Landry belongs to a protected class; (2) she suffered unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known about the harassment and failed to take prompt remedial action. *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 298 (5th Cir. 2001)). Even drawing all inferences in favor of Landry as we must, we determine that a jury could not.

Leesville does not dispute the first three elements. What Leesville does contest, and what the district court rested its holding on, is whether Doe's harassment affected a term, condition, or privilege of Landry's employment. For sexual harassment to meet this standard, it must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *West v. City of Houston*, 960 F.3d 736, 741–42 (5th Cir. 2020) (quoting *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479 (5th Cir. 2008)). Not only must the plaintiff subjectively perceive the harassment as severe or pervasive, but that perception must be objectively reasonable. *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003).

Landry correctly points out that this standard is disjunctive—she need only show that this harassment was severe *or* pervasive. *Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 163 (5th Cir. 2007). Arguing that she has met this bar, Landry points to two interactions with Doe: (1) Doe touching her butt for about five seconds and (2) Doe calling her a "sexy, beautiful black woman" a few minutes later.

Before analyzing these specific incidents, we must take stock of their context: Landry was a nurse and Doe was a patient at a rehabilitation hospital. Our precedents have recognized that the "unique nature" of these kind of care facilities "is an important consideration" when determining whether harassment was severe or pervasive. *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 322 (5th Cir. 2019). That is because, as the Leesville employee handbook recognizes, "[i]nappropriate sexual conduct by patients" is unfortunately "not uncommon in a healthcare facility." This behavior is often a result of patients suffering from illness and diminished capacity. *See id.*

With this context, the harassment Landry endured, though offensive, was not severe. We have previously refused to find severe harassment when, among other things, a coworker made a comment about a fellow employee's body, slapped an employee's behind with a newspaper, and held her cheeks and tried to kiss her. *See Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (characterizing the slap as simple teasing and the attempted kiss as "not serious"); *see also Barnett v. Boeing Co.*, 306 F. App'x 875, 879 (5th Cir. 2009) (concluding that unwanted touching, leering, sexually suggestive comments, and intimidation did not amount to severe harassment); *Gibson v. Potter*, 264 F. App'x 397, 398–99, 401 (5th Cir. 2008) (finding no severe harassment when supervisor grabbed employee's buttocks, made suggestive comments, and engaged in "sex talk"). The cited cases all involved more serious harassment than occurred in this case. That

in combination with the patient-caregiver setting here compels a finding that this harassment was not severe.

Perhaps acknowledging that these incidents do not rise to the level of severe harassment, Landry spends the bulk of her brief arguing that Doe's harassment was pervasive. But that theory does not work either. Landry can point to only two instances of harassment, both lasting only a few seconds. The harassment did not occur every time she interacted with Doe, nor even most times she interacted with Doe. And the incidents stopped after one day, even though Landry worked on his floor for several more days. Whatever the floor for pervasiveness, this conduct falls short.

*Royal v. CCC & R Tres Arboles, L.L.C.* does not counsel otherwise. 736 F.3d 396 (5th Cir. 2013). Landry emphasizes that case in which two coworkers repeatedly went into a female employee's office and sniffed her. *Id.* at 402. Each coworker did so twelve times over the course of her four-day employment, which the court concluded could qualify as pervasive. *Id.* at 402–03. The harassment in *Royal* was much more frequent than it was in this case.

We thus conclude that no reasonable jury could have found that Doe's harassment affected a term, condition, or privilege of Landry's employment.

## III

Landry asserts that Leesville racially discriminated against her because she, an African-American woman, was fired after a patient complaint, while her white coworkers who faced nearly identical complaints all kept their jobs. Her claim rest on circumstantial evidence, so we use the *McDonnell Douglas* burden-shifting framework. *See Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). That means Landry carries the initial burden of establishing a prima facie case of discrimination, and if she does, the burden shifts to Leesville to articulate a "legitimate, nondiscriminatory

reason" for firing her. *Id.* at 561–62 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If Leesville satisfies that standard, the burden shifts back to Landry to show that Leesville's reason was pretextual. *Id.* at 562.

The district court held that Landry failed at step one by not making out a prima facie case for race discrimination.[2] Specifically, the court concluded that she failed to establish that she was treated less favorably than other similarly situated employees outside the protected group. *See Sanders*, 970 F.3d at 561 (listing elements for racial discrimination claim). A "similar situated comparator," is one who was "treated more favorably than the plaintiff under 'nearly identical circumstances.'" *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 410 (5th Cir. 2016) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). "Nearly identical" does not mean identical—only in the "rarest of circumstances" are the situations of two employees "totally identical." *Lee*, 574 F.3d at 260. But it does require, "critically," that the employees engaged in nearly identical conduct but drew dissimilar employment decisions. *Id.* Put differently, if the "difference

---

[2] Landry argues that because this is a work-rule violation case—the rule being that staff act appropriately toward patients—she can make out a prima facie case of racial discrimination by showing that she never violated the rule in the first place. *See Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012). She admits that district courts in our circuit are split on whether a plaintiff can establish a prima facie case "merely by denying" that she violated the rule. *See Harkness v. Bauhaus U.S.A., Inc.*, 86 F. Supp. 3d 544, 556 (N.D. Miss. 2015); *see also Lacy v. Dallas Cowboys Football Club*, 2012 WL 2795979, at *7 (N.D. Tex. July 10, 2012). We need not resolve this split because Landry does not sufficiently deny that she violated the rule. She admits that she engaged in the conduct that formed the basis for the violation—turning on the lights in Doe's room late at night and confronting him about the rumor. She only argues that these actions are not properly considered inappropriate conduct. To deny a work-rule violation, however, a plaintiff must do more than disagree with an employer's classification of their behavior; they must deny that they engaged in the conduct altogether. *See Randle v. Dragados USA, Inc.*, 2021 WL 40271, at *5 (S.D. Tex. Jan. 5, 2021).

between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) (emphasis added).

We agree with the district court that Landry failed to show a nearly identical comparator. Based on the investigation, Landry's conduct leading to her termination included: (1) a pattern of (2) verbally aggressive speech toward patients with (3) one instance causing patient injury.[3] Landry proffers six possible comparators.

Four of the alleged comparators do not qualify as such because their misconduct was not intentional like Landry's was. Two of them improperly used restraints on a patient to keep him in his wheelchair. One briefly left a mentally handicapped patient unattended in the shower, and the other refused to bathe a patient. These comparators were not verbally hostile to patients, nor did any cause patients injury. Landry focuses on the fact that some of these comparators were written up for "inappropriate conduct with a patient"—the same rule she violated—but this does not change the analysis. *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012). Whether the conduct is similar turns on the comparable seriousness of the

---

[3] Landry insists that none of this is true, but whether the conduct actually happened is not the proper focus of the inquiry. The relevant perspective is what the employer knew at the time of the adverse employment decision. *Lee*, 574 F.3d at 261 n.27. And Causey, the employer, was told during the investigation that this conduct did occur. That he credited Turner, Doe, Cobb and the physician's statements over Landry's is immaterial. *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007). "[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment action. Management does not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).

offenses, "not necessarily on how a company codes an infraction under its rules and regulations." *Id.*

The final two comparators are closer but still not close enough to support the inference that the different treatment was the product of discrimination.    One nurse left a patient with known balance issues unattended in the bathroom, and the patient fell and suffered a head laceration.  While this is similar in that the patient suffered an injury, the wrongful conduct is much different than Landry's.  That nurse neglected a patient; Landry was intentionally hostile to a patient.  The last comparator used an inappropriate tone when questioning a patient about incontinence, akin to the way Landry spoke to Doe.  But that patient was not injured.

None of these comparators both spoke aggressively to a patient and caused an injury.  And most notably, none had a *pattern* of speaking rudely to patients.  Without a nearly identical comparator, Landry has not made out a prima facie case of racial discrimination.  The district court correctly granted Leesville's motion for summary judgment on this claim.

IV

Landry lastly asserts that Leesville retaliated against her for complaining about Doe's harassment.    This claim, like Landry's discrimination claim, is based on circumstantial evidence, so we apply the *McDonnell Douglas* framework.  To make out a prima facie case, Landry must show that: (1) she engaged in activity protected by Title VII, (2) Leesville took an adverse employment action, and (3) there was a causal link between the protected activity and the adverse action.  *See Banks v. E. Baton Rouge Par. Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003).

We start with the first element.  An employee engages in protected activity when she opposes an unlawful employment practice.  42 U.S.C. § 2000e–3(a).  Landry alleges that she opposed sexual harassment when she

complained about Doe's comment and inappropriate touching to her supervisor. As we explained earlier, Doe's conduct does not rise to the level of Title VII harassment. *See supra* Part II. For retaliation claims, however, it is enough that the plaintiff shows she "*reasonably believed* the employment practice to be unlawful." *E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 240 (5th Cir. 2016) (emphasis added). The question is therefore whether a jury could conclude that Doe's harassment fits in the "zone of conduct that falls short of an actual violation but could be reasonably perceived to violate Title VII." *Id.* at 242.

It was not reasonable to believe Doe's conduct was sexual harassment. To understand why, it is helpful to look at cases in which similar conduct was at issue and we found a reasonable belief could exist. In *Rite Way*, an employee saw her supervisor pretend to slap another employee on her bottom and, a few days later, overheard that supervisor tell the same employee that he was admiring her bottom. *Id.* at 238. The harassed employee complained, and the company opened an investigation. *Id.* Upper-level management came and questioned the employee who witnessed the incident; the manager "tried to talk her out of reporting," but the employee reported what she saw. *Id.* In holding that the employee-witness could have harbored a reasonable belief that the supervisor's conduct violated Title VII, we emphasized that the harassment came "from a person in a supervisory position" and the "setting in which [the employee] voiced her complaint"—a human resources investigation, which suggested the conduct was serious. *Id.* at 243–44.

Similar circumstances led to the same result in *Scott v. U.S. Bank National Association*. 16 F.4th 1204 (5th Cir. 2021). There, an employee overheard his supervisor "make a comment indicative of unlawful behavior" and reported it "in response to an investigator's request." *Id.* at 1212. "Considering [the employee's] statement together" with the investigation

and that the harassment came from a supervisor, we held that the employee alleged facts that could support a reasonable belief that his employer violated Title VII. *Id.*

The context of Landry's case points the other way. Leesville did not open an investigation into Doe's conduct; Landry thus had no external indication that his conduct violated the law the way the plaintiffs in *Rite Way* and *Scott* did. And the harasser here was not a supervisor—he was a patient in a healthcare facility. While neither an investigation nor harassment coming from a supervisor are necessary to establish reasonable belief in retaliation claims, both are indicia that an employee's belief was likely reasonable. Those considerations are not present here. Add in the circumstance that the offensive conduct came from a nursing home patient where such patient conduct may not be unusual, *see Gardner*, 915 F.3d at 322, and it was not objectively reasonable to believe the harassment was unlawful.

As a result, Landry's retaliation claim cannot proceed.

***

The judgment is AFFIRMED.